## THE MORAN NO. 107.

## THE FLORAL E. ROE.

### MORAN BROS. CONTRACTING CO., Inc., v. SEABOARD SAND & GRAVEL CORPORATION et al.

No. 13163.

District Court, E. D. New York.

Nov. 23, 1932.

Bigham, Englar, Jones & Houston, of New York City (R. F. Shaw, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Carl F. Vander Clute, of New York City, of counsel), for respondent.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for impleaded respondent.

BYERS, District Judge.

Moran Brothers Contracting Company, Inc., for convenience to be referred to as Moran, as charterer in possession of the scow Moran No. 107, sues Seaboard Sand & Gravel Corporation, to be referred to as Seaboard, in admiralty, for breach of contract in failing to return the said scow, at the expiration of the customary New York Harbor charter, in as good condition, etc.

The answer pleads that any damages sustained by the scow, while under such charter, were due to ordinary wear and tear, and to causes beyond the respondent's control and for which it is not responsible. The Seaboard also filed a petition impleading Daniel Roe Towing & Transportation Co., Inc. (to be referred to as Roe Company), bringing it into the cause as owner of the steamtug Floral E. Roe, and process was sought against the latter. Claim was filed and answer made to the original libel and the petition, by the impleaded respondent.

There is no dispute as to the facts, save the extent to which the scow was brought down in the water, by the cargo laden upon her; that consisted of 645 cubic yards of ¾ inch gravel, placed on board, by Seaboard, about one week prior to January 16, 1931, in the harbor of Port Jefferson, Long Island.

The scow was 112 feet long, 34 feet wide, and had 10-foot sides. It was built in 1929, and was therefore nearly new, and at the time of loading was tight, staunch and in all respects seaworthy. This was the biggest load of gravel that the scow had ever taken, by a margin of 9 cubic yards; the scow was trimmed to her starboard aft corner (containing a pump) where her free-board is found to have been less than 1 foot; on the port side aft it was 1 foot; amidships the decks were to, and forward the free-board was about one foot and a half.

On January 16, 1931, Seaboard employed the Roe Company to tow this scow, and another, the Anderson Dana, to Portchester, New York. The Dana was of about the same dimensions as the Moran No. 107, and was laden with sand. The tow was made up at the Moran stake boat in the harbor, tandem, with the Dana ahead of the Moran No. 107, because the former had the greater free-board as the scows were laden. The free-

board at the stern of the Dana was about the same as at the bow of the Moran No. 107.

The scows were close-coupled, and departure was had at about 4:30 o'clock in the afternoon, the weather being clear, the Sound smooth, and there being a light wind out of the west. The trip proceeded without incident until the tow was between Eaton's Neck and Crane's Neck, on the Long Island shore, when the wind suddenly increased, and soon became what is described as of gale force.

It is not contended that there was reason to anticipate this development, and departure from Port Jefferson is not criticized.

The seas rose with the wind (which held from the same quarter) and came over the Moran No. 107 frequently and with force, and the scows began to bump. Thereupon, at about 8:00 p. m., the scow captains loosened away the hawsers connecting the scows, so that the vessels were about 6 feet apart. The bumping continued, and hawsers were again extended, so that the distance was increased to not less than 8 feet. The hawsers were 75 feet long, with an eye in each, on the bitt of each scow. The hawser of the Moran No. 107 led to a stern bitt on the Dana, around which a turn or two were made, and back to the bitt of the Moran No. 107. And so with the Dana's hawser, which led astern to the Moran No. 107, and back to the bitt on the former.

In spite of the second loosening away, the scows continued to bump, and around 9:00 p. m. the Dana's seams were opened, and her captain went below to stop the leaks with temporary filling, and, while he was so engaged, the captain of the Moran No. 107 came aboard the Dana, and then cut the Moran No. 107 adrift by severing the hawsers. This was done at about a half hour or more before the tug was able to make port in Huntington Harbor, where refuge was sought.

The tug discovered what had been done, having thrown her search-light on the tow; being assured by observation that both scow captains were safe on the Dana, the latter was brought into quiet waters at Huntington, and there secured. The tug then proceeded out into the Sound to take the Moran No. 107 again in charge; she was found, after an hour's search, riding the seas, in the trough, and the tug was able to put a line on board, but, when a strain thereon was taken, the scow capsized, and in that shape was brought into Huntington Harbor.

The capsizing caused the damage to recover which this libel was filed.

Moran is found to have proved the bailment of the Moran No. 107 to Seaboard, and the return of the subject of the bailment in a damaged condition, not caused by ordinary wear and tear, and is therefore entitled to a presumption of fault on the part of Seaboard; and the question is whether the latter has shown that the damage was not due to Seaboard's neglect [see Alpine Forwarding Co. v. Pennsylvania R. Co. (C. C. A.) 60 F.(2d) 734; Ira S. Bushey & Sons, Inc., v. W. E. Hedger & Co., Inc. (C. C. A.) 40 F.(2d) 417, and cases cited therein], or to the neglect of the Roe Company, to whom Seaboard entrusted the scow [see White et al. v. Upper Hudson Stone Co. et al. (C. C. A.) 248 F. 893].

The libelant argues that the Seaboard overloaded the scow, and has thus failed to go forward with the burden of evidence resting upon it.

That the Moran No. 107 was deeply laden has been stated, for she was decks to amidships.

That this was the cause of her being cut adrift by the scow captain, or of her capsizing when later a line was put on her to bring her into Huntington Harbor, lies in argument rather than proof.

The same tug captain who testified that he refused to take her in tow because she was low in the water, admitted that he had towed, without mishap, many scows and barges which were laden as deeply. This trip was without incident until the high wind and sea created the conditions which have been recited.

The same captain likewise was forced to seek refuge in Huntington Harbor with his five barges or scows (respective free-boards undisclosed), the same night, and that is persuasive as to the severity of the storm, but it does not prove that, if the Moran No. 107 had been less laden, so that she had a foot of free-board amidships for instance, the storm would not have caused her captain to cut her adrift.

There was testimony from the Seaboard superintendent, that it is customary to load these scows, and send them out, decks to, and, if the hatches are closed and tight, no harm comes to the vessels, even though they ship water on deck continuously.

That testimony was not controverted.

The captain of this scow was in Port Jef-

ferson for a week, or nearly so, and, during all of that time, she was laden to the depth shown at departure on this occasion, and yet no complaint by reason thereof was made to Moran, or protest to Seaboard.

Such negative conduct was consistent with a realization that his scow was laden in accord with usual practice.

It is urged that O'Brien Bros., Inc., v. City of New York et al. (C. C. A.) 9 F.(2d) 542, helps the libelant, because improper loading was there visited upon the bailee, where the scow sank in calm weather, while moored. The court found that the instability of the load was due to the method employed in loading; and stated that the sinking was the result of the misplacement of the load. It was observed that the fact, that the method employed in this instance was the same as that which had been theretofore pursued, was no answer to the claim of liability.

That decision does not aid this libelant; first, because overloading, as distinguished from improper loading, has not been shown; and, second, because the bailee does not seek to justify its practice on previous experience, but on the manifest showing that no harm came to this scow until violent conditions of wind and water came to prevail. When such developed, the scows began to pound, and the Moran No. 107, to roll in the seas.

The waves broke over both scows, and their loads as well, which means that, if the Moran No. 107 had been laden no deeper in the water than the Anderson Dana, seas would have boarded her, as they did the latter.

The captain of the Dana testified that the captain of the Moran No. 107 stated to him, during the storm, that the Moran No. 107 was taking water through her hatches badly; if this were the fact, the result would be an accumulation of water in volume below decks, which would shift from side to side, and cause the scow to roll. It is difficult otherwise to account for the rolling, because, if all the water that came on deck had found its way outboard through the scuppers, the Moran No. 107 would have ridden the storm as well as the Dana.

So far as loading is concerned, it is thought that Seaboard has shown that what was done on this occasion was quite conventional, and safe under weather conditions reasonably to be anticipated on the day in question.

The testimony as to the length of the hawsers between the scows shows that slackening away to a distance apart of from 8 to 10 feet was permitted. The lines were part of the equipment of the scows, and not in the control of either Seaboard or the Roe Company.

■ The tug was responsible for the make-up of the tow, under familiar rules, but there is no criticism of this at departure.

When violent conditions of wind and sea developed, the tug signaled to the tows to slacken away; the signal or order was given by megaphone, but could not be heard. However, the slackening was attended to by the scow captains, because they realized the necessity for it. Nothing in that aspect of the case affects the question of liability for damage. There is some argument made for Seaboard, that the lines were not long enough to permit slackening to 15 feet, at which distance there would have been no pounding, as the tow was heading into the wind.

That is argumentative, and is not deemed to have been established. As stated, it is not found to have been a controlling circumstance in any case.

■ The evidence fairly points to the conclusion that it was the cutting adrift of the scow which resulted in her being brought into the position described when the effort was made to pick her up, that is, in the trough of the waves. She was not put there by any act or omission of the Seaboard, or of the Roe Company, but by her captain, who was in charge of her lines (Dailey et al. v. Carroll et al. [C. C. A.] 248 F. 466), and, in cutting her adrift, he was acting for Moran, and not for Seaboard, or the Roe Company.

■ Whether the danger to the two scows was as imminent as the captain of the Moran No. 107 undoubtedly believed it to be, when he acted as he did within 45 minutes or so of a safe harbor, no one can now assert, but to visit upon the bailee the consequence of that decision seems not to be justified by the evidence.

It is concluded therefore that Seaboard has carried forward the burden of evidence, and thus met the requirement resting upon it, and its delegate, the Roe Company.

Libel dismissed. Settle decree on notice.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals of ownership and incorporation.